UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

ELIZABETH ANDRES, *et al.*,                )
                                            )
            Plaintiffs,                     )
                                            )
    v.                                      )     Case No. 1:17-cv-00377
                                            )
TOWN OF WHEATFIELD, OCCIDENTAL              )
CHEMICAL CORPORATION, BELL                  )
HELICOPTER TEXTRON, INC.,                   )
CROWN BEVERAGE PACKAGING, LLC,              )
GREIF, INC.,                                )
REPUBLIC SERVICES, INC.,                    )
HONEYWELL INTERNATIONAL INC.,               )
INDUSTRIAL HOLDINGS CORPORATION,            )
SAINT-GOBAIN ADVANCED CERAMICS,             )
LLC, and CARBORUNDUM                        )
CORPORATION,                                )
                                            )
            Defendants.                     )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
MOTIONS TO DISMISS FILED BY DEFENDANTS TOWN OF WHEATFIELD,
OCCIDENTAL CHEMICAL CORPORATION, BELL HELICOPTER
TEXTRON, INC., CROWN BEVERAGE PACKAGING, LLC, GREIF, INC.,
REPUBLIC SERVICES, INC., HONEYWELL INTERNATIONAL INC., AND
INDUSTRIAL HOLDINGS CORPORATION AND GRANTING MOTION FOR
JUDGMENT ON THE PLEADINGS FILED BY DEFENDANT SAINT-GOBAIN
ADVANCED CERAMICS, LLC**
(Docs. 165, 166, 167, 168, 170, 171, 172, 195, 216)

Plaintiffs are current or previous owners or renters of residential properties in

North Tonawanda, New York, and the surrounding area, who have lived in that area for

at least one year (collectively, "Plaintiffs"). They seek to bring a class action suit against

the Town of Wheatfield (the "Town"), Occidental Chemical Corporation ("OCC"), Bell

Helicopter Textron, Inc. ("BHT"), Crown Beverage Packaging, LLC, Greif, Inc.,

Republic Services, Inc., Honeywell International Inc. ("Honeywell"), Industrial Holdings

Corporation ("Industrial Holdings"), Saint-Gobain Advanced Ceramics, LLC ("Saint-Gobain"), and Carborundum Corporation (collectively, "Defendants") arising out of Plaintiffs' alleged exposure to toxic and hazardous substances emanating from the Town's Nash Road landfill (the "Site").

In their Third Amended Complaint ("TAC"), Plaintiffs assert the following claims: Count One: response costs incurred or to be incurred by Plaintiffs in connection with the Site pursuant to Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"); Count Two: declaratory relief as to future costs under Section 113(g)(2), (4) of CERCLA; Count Three: the Town's violation of Plaintiffs' substantive due process rights for a state-created danger pursuant to 42 U.S.C. § 1983; Count Four: the Town's violation of Plaintiffs' substantive due process rights to bodily integrity pursuant to 42 U.S.C. § 1983; Count Five: state law negligence against the Town; Count Six: state law strict liability against all Defendants; and Count Seven: state law trespass against the Town.

## I.   Procedural Background.

On March 26, 2017, Plaintiffs filed this action in New York state court. On May 3, 2017, the lawsuit was removed to federal court. On October 27, 2017, Plaintiffs filed their First Amended Complaint. Defendants responded by filing motions to dismiss for failure to state a claim pursuant to Federal Rule 12(b)(6), which Plaintiffs opposed. At a June 18, 2018 hearing, the court granted the motions to dismiss on the record and granted Plaintiffs leave to amend.

On August 17, 2018, Plaintiffs filed the Second Amended Complaint ("SAC"). Defendants again moved to dismiss, arguing Plaintiffs failed to state a claim for relief because they failed to plausibly allege their injuries, a theory of causation, and the essential elements of claims under CERCLA or for trespass. The Town filed a separate motion to dismiss on the basis that Plaintiffs' conclusory allegations were insufficient to plead claims under 42 U.S.C. § 1983. Plaintiffs again opposed dismissal. On February 8, 2019, the court held oral argument on the motions and on June 14, 2019 the court granted

the motions to dismiss without prejudice but declined to affirmatively grant Plaintiffs leave to amend their complaint.

On July 15, 2019, Plaintiffs moved for post-judgment relief and leave to amend the SAC. In doing so, they submitted their proposed Third Amended Complaint ("TAC"). Defendants opposed the motion and on March 12, 2020 the court denied as moot Plaintiffs' motion for post-judgment relief and granted in part and denied in part Plaintiffs' motion to amend the SAC.

On April 2, 2020, Plaintiffs filed the TAC. Defendants moved to dismiss for a third time on the basis that Plaintiffs fail to plausibly allege response costs under CERCLA and fail to allege the essential elements of a strict liability claim. Defendants BHT and Honeywell filed separate motions to dismiss, arguing that Plaintiffs have failed to plausibly plead either individual or successor liability, migration pathways, and injuries against them. Defendant Industrial Holdings filed a separate motion to dismiss the *Andres* Plaintiffs' claims because they are time-barred. Plaintiffs opposed the motions. Defendants replied on June 24, 2020 and August 5, 2020 at which time the court took the pending motions to dismiss under advisement.

On June 22, 2020, Saint-Gobain answered the TAC and on July 29, 2020 it moved for judgment on the pleadings. Plaintiffs opposed the motion on September 2, 2020 and Saint-Gobain replied on September 25, 2020 at which time the court took that motion under advisement.

## II.     Factual Allegations Set Forth in the TAC.

The Site is a closed, unlined, uncapped landfill on twenty-five acres of real property located at 7415 Nash Road, Wheatfield, New York, immediately north of the City of North Tonawanda and east of Nash Road. At all times relevant to this action, the Town owned the Site, which was operated by the Niagara Sanitation Company between 1964 and 1968 for the disposal of municipal and industrial wastes.

Prior to its closure, the Site was used by the Niagara Falls Air Force Base, Bell Aerospace, Carborundum Corporation, Frontier Chemical, Graphite Specialties, Continental Can, and Greif Brothers, as well as local municipalities, to dispose of

3

municipal, industrial, and hazardous waste. In 1968, approximately 1,600 cubic yards of waste from the Love Canal Landfill, including material from the Hooker Chemical and Plastics Corporation ("Hooker"), was deposited at the Site in a trench excavated in the underlying clay. At the Love Canal Landfill, groundwater contamination caused by seepage of over eighty industrial chemicals eventually led to the evacuation of approximately 950 families in a ten-square-block radius surrounding the area. Plaintiffs allege that 2015 confirmatory testing demonstrates that Love Canal wastes are still present at the Site.

Shortly after the deposit of Love Canal waste at the Site in 1968, the Site ceased operation. The nature of the hazardous waste within it was allegedly not disclosed to the surrounding neighbors. Plaintiffs allege that, for decades, they have used the Site for recreational purposes including walking, biking, riding of all-terrain vehicles and motorized dirt bikes, fishing, hunting, trapping, and dog-walking. Plaintiffs assert that the use of bikes and motorized vehicles created "airborne migration material from the Site during dry conditions[,]" (Doc. 160 at 13, ¶ 45) and that during wet conditions, hazardous material was carried off-site via shoes, vehicles, and pets.

In 1979, an "Interagency Task Force on Hazardous Wastes Draft Report on Hazardous Waste Disposal in Erie and Niagara Counties, New York" identified the Niagara Falls Air Force Base, Bell Aerospace, Carborundum Corporation, Frontier Chemical, Graphite Specialties, Continental Can, and Grief Brothers as entities that disposed of waste at the Site prior to its closure. (*See* Doc. 160-6 at 3.) The report describes the waste at the Site as including "[c]austics, plating tank sludge and other industrial waste" and notes "protruding refuse still apparent; [a]rea subject to flooding." *Id.* Each Defendant or its alleged predecessor in interest is identified in the report as having disposed of toxic waste at the Site with the exception of Occidental Chemical Corporation, which is named as a Defendant individually and as successor to Hooker. Plaintiffs subsequently identified Defendants Industrial Holdings Corporation and Saint-Gobain Advanced Ceramics, LLC as successors to Carborundum Corporation based on discovery responses, New York State Department of State Division of Corporations

records, and New York State Department of Environmental Conservation ("NYSDEC")
records.

In 1981, the Niagara County Department of Health (the "Department of Health")
investigated the Site and concluded that "the potential for migration of chemicals off-site
is present." (Doc. 160 at 13, ¶ 46) (internal quotation marks and alteration omitted). The
Department of Health recommended that the Town conduct an abatement and required
the Site to be properly closed. According to Plaintiffs, "[t]his was not done." *Id.*

In 1988, the Environmental Protection Agency ("EPA") determined that
"hazardous waste excavated from the Love Canal Landfill was disposed of at the Site in a
trench of soft, layered clay and that no engineered barriers were installed." *Id.* at 14, ¶ 47.
The excavated materials were allegedly placed at the Site's northeast end and covered
with soil. Plaintiffs allege that water samples taken at the Site "revealed benzene at 4500
mg/L, chloro[benzene] at 590mg/L, toluene at 14,000 mg/L, and acetone at 2,300
mg/L[,]" *id.*, and that lead samples ranged from 67 to 20,000 parts per billion.

The 1988 EPA Site Inspection Report (the "1988 Report") indicates that the Site
was flat, drainage was poor, and prior to its use as a landfill, the Site was a swamp. The
1988 Report further notes that: (1) groundwater was contaminated and the surrounding
population could potentially be affected; (2) surface water and soils were rusty in
appearance and methylene chloride, total organic halogens, and toluene were detected;
(3) soil samples contained metal and organic contamination; (4) the Site was used by
local residents as a play area and some local residents may have drawn water from the
contaminated aquifer; and (5) the Site included pools of orange-tinted standing water as
well as rubbish protruding from the ground.

In 1989, the New York State Department of Environmental Conservation
("NYSDEC"), Division of Hazardous Waste Remediation performed a "Phase II
Investigation" which allegedly revealed that shallow groundwater at the Site contained
"significant contamination of toxic organic compounds and metals and that there was a
potential for the contaminants to migrate [off-site]." (Doc. 160 at 14, ¶ 49.) NYSDEC
recommended that additional work be performed to determine the potential for off-site

migration and whether migration was presently occurring, including a soil-vapor survey and review of off-site wells. To limit public access to the Site, NYSDEC advised that the Site be capped and a fence constructed. Finally, NYSDEC recommended an investigation of whether the disposal trenches dug for the Love Canal waste had breached the clay layer and exposed the regional aquifer beneath the Site to contamination.

Plaintiffs allege that, despite the EPA's Report and NYSDEC's investigation, "no action was taken[,] . . . none of the recommendations were performed[,]" and the Site "remained just as it was." *Id.* at 15, ¶ 50. The adjacent community was allegedly not informed of any findings or directives or warned of any potential danger to persons or property, and residents continued to use the Site for recreational activities.

On October 2, 2014, OCC agreed to an Order on Consent and Administrative Settlement for the Site (the "Order and Settlement") pursuant to which they agreed to reimburse the NYSDEC for costs incurred in connection with the Site without admitting wrongdoing or liability.

On December 21, 2015, NYSDEC issued a Public Notice with regard to the Site pursuant to New York's Superfund Program, entitled "Inactive Hazardous Waste Disposal Site Classification Notice[,]" which stated in relevant part:

> As of the date of this notice, [the Site] . . . presents a significant threat to public health and/or the environment for the following reason(s): The [S]ite is a former municipal and industrial landfill that accepted waste from multiple sites, including Niagara Falls Air Force Base, Bell Aerospace, Carborundum, Frontier Chemical, Graphite Specialties, Continental Can, and Gr[ei]f Brothers. Site contaminants include metals, polycyclic aromatic hydrocarbons, polychlorinated biphenyls, pesticides, caustics, and plating tank sludge. The landfill does not have a Part 360 cap or access restrictions. Both conditions indicate a concern for potential exposures to people who enter the [S]ite. This exposure concern has been documented as people are using the landfill as a jogging and play area. Dirt bike trails are evident throughout the [S]ite and use of such has resulted in landfill materials becoming exposed to the surface. Therefore, the [S]ite represents a significant threat to the environment and public health. If you own property adjacent to this [S]ite and are renting or leasing your property to someone else, please share this information with them.

*Id.* at 15, ¶ 51.

Plaintiffs allege that Town officials and "private agents with decision-making authority," including but not limited to former City Supervisor Stanley Brzezinski, landfill operator Angelo Zino, and Peace Justice Fred Lemke, affirmatively acted to create and exacerbate toxic contamination at the Site. *Id.* at 199, ¶ 680. In support of this claim, Plaintiffs assert that, in or around 1968, Town officials, including but not limited to Peace Justice Lemke and Supervisor Brzezinski, actively sought or approved of the disposal of highly toxic chemicals from the Love Canal at the Site. In or around September 1968, the Department of Health requested the Town take immediate steps to prepare the Site for permanent closure, but Town officials allegedly continued to encourage the Site's use and operation. Town officials also allegedly "repeatedly and purposely" circumvented the regulatory directives of the Department of Health and ignored citizen complaints related to the Site. *Id.* at 200, ¶ 684.

Plaintiffs contend that the Town took steps to conceal the risks associated with the Site, including "creat[ing] a culture of deliberate indifference about the safety and conditions of the [Site] and its potential impact to Plaintiffs[.]" *Id.* at 201, ¶ 691.

According to Plaintiffs, the Town:

> was fully aware that the Site contained an unknown quantity of toxic chemicals, toxic contaminants and waste, industrial solvents and sludge, and banned pesticides, including but not limited to Aldrin, Arsenic, Barium, BHC (Benzene Hexachloride), Benzo-trichlorides, Benzene, Caustics, Chlorobenzenes, Chromium, OC Pesticides, DDT, DDE, and DDD, Dieldrin, Dioxin, Endrin (Endrin Aldehyde), Hexachlorocyclohexane, Lindane (gamma- BHC), Lead, Mercury, Petroleum products (including hexane, benzene, toluene, xylenes, naphthalene, and fluorine), Plating tank sludge, Phenol, PAHs or Polycyclic aromatic hydrocarbons, polychlorinated biphenyls or PCBs and Love Canal wastes identified herein.

*Id.* at 15-16, ¶ 52. Despite this awareness, the Town "left the Site abandoned for decades, without proper cleanup, oversight, or management, with no signage as to the danger, no fencing of the property to prevent access, and without engineering controls to prevent seepage and transport of contamination on to the surrounding properties." *Id.* at 16, ¶ 52. Groundwater testing at the Site, conducted by NYSDEC in 1988 and on several occasions

since 2013, found multiple substances at concentrations above Ambient Water Quality Standards and Guidance Values. Testing conducted on behalf of the Plaintiffs in 2017 and 2019 confirmed the presence of some of the contaminants on their properties as well.

Plaintiffs allege various pathways by which humans can be exposed to contaminants, including air, surface water, soil, and groundwater. A February 2019 Remedial Investigation Report prepared for the NYSDEC noted that trespassers at the Site could be exposed through dermal contact with or ingestion of soil or surface water, and that nearby residents could be exposed through "inhalation of contaminated soil from wind dispersion of fugitive dust from the [S]ite to off-site areas" as well as through dermal contact with, or ingestion of, surface water. *Id.* at 31, ¶ 118.

Plaintiffs contend they have suffered from health problems and medical conditions associated with hazardous substances allegedly contained at the Site. For example, they note that "[w]orkers exposed to moderate levels of [a]ldrin over a longer time have suffered from headaches, dizziness, irritability, vomiting, and uncontrolled muscle movements. Animal studies have found that exposure to aldrin affects the nervous system, liver, and ability to fight infections." *Id.* at 19, ¶ 64. Plaintiffs allege that each of them "ingested, inhaled[,] and had direct dermal contact with surface and subsurface soil and materials" and that each Plaintiff's medical conditions were "caused or contributed to by exposure to" the substances known to be deposited at the Site and associated with the Plaintiff's symptoms. (Doc. 160 at 41, ¶¶ 150-51.) They further assert that the contaminants from the Site "have additive and synergistic effects which can cause additional health impacts beyond the individual chemicals that were originally deposited[.]" *Id.* at 40, ¶ 149.

## III.   Conclusions of Law and Analysis.

### A.   Standards of Review.

In order to survive a Rule 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The sufficiency of a complaint is evaluated using a "two-

pronged approach[.]" *Hayden*, 594 F.3d at 161 (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 679).

First, the court discounts legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Iqbal*, 556 U.S. at 678. Second, the court considers whether the factual allegations, taken as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. This second step is fact-bound and context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.*

The court does not "weigh the evidence" nor "evaluate the likelihood" that a plaintiff's claims will prevail. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 201 (2d Cir. 2017). In ruling on a motion to dismiss or a motion for judgment on the pleadings, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see also L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).

"In deciding a Rule 12(c) motion [for judgment on the pleadings], [the court] employ[s] the same standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6)." *Hayden v. Paterson*, 594 F. 3d 150, 160 (2d Cir. 2010) (internal quotation marks omitted). Contrary to Plaintiffs' contentions, Defendants are not precluded from challenging Plaintiffs' claims merely because a particular claim was included in a prior version of the complaint, especially where, as here, Defendants raise new grounds for dismissal.

## B.   Whether Plaintiffs Adequately Plead a CERCLA Cost Recovery Claim.

In Count One, Plaintiffs seek to recover response costs under CERCLA for expenses incurred in connection with monitoring, assessing, and evaluating an alleged release of the hazardous substances at the Site. Plaintiffs allege that they have each "incurred CERCLA response costs described herein jointly with the other named Plaintiffs through their agents/attorneys" and that they are each "legally obligated by

contract to reimburse response costs already expended and continuing response costs . . .
to Plaintiff's agents/attorneys, who have advanced such costs." (*See e.g.,* Doc. 160 at 42,
¶ 153) (describing response costs incurred by Plaintiff Elizabeth Andres). Defendants
seek dismissal of this claim, arguing Plaintiffs have failed to adequately allege that each
Plaintiff has paid, or is obligated to pay, non-contingent response costs as required under
CERCLA.

CERCLA was enacted "to address the cleanup of hazardous waste by imposing
strict liability for necessary cleanup costs incurred that are 'consistent with the national
contingency plan.'" *N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212,
220 (2d Cir. 2014) (quoting CERCLA § 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B)).
Pursuant to CERCLA's strict liability standard, a plaintiff must allege that "(1) the
defendant falls within one of the four categories of 'responsible parties'; (2) the
hazardous substances are disposed of at a 'facility'; (3) there is a 'release' or threatened
release of hazardous substances from the facility into the environment; [and] (4) the
release causes the incurrence of 'response costs'" covered by the statute. *United States v.
Alcan Aluminum Corp.*, 964 F.2d 252, 258-59 (3d Cir. 1992) (quoting 42 U.S.C. § 9607)
(footnotes omitted).

"[A] party may be found to have 'incurred' a cost without having actually paid for
it" and "a finding that a cost has been 'incurred' may be based upon an existing legal
obligation." *Trimble v. Asarco, Inc.*, 232 F.3d 946, 958 (8th Cir. 2000), *abrogated on
other grounds by Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546 (2005).
"[P]laintiffs may 'incur' costs even if another entity actually pays for those costs"
because " the relevant inquiry is 'who assumed a legal obligation to pay.'" *Roosevelt
Irrigation Dist. v. Salt River Project Agric. Improvement and Power Dist.*, 222 F. Supp.
3d 757, 765 (D. Ariz. 2016) (quoting *Wilson Rd. Dev. Corp. v. Fronabarger Concreters,
Inc.*, 971 F. Supp. 2d 896, 910 (E.D. Mo. 2013)). However, "the mere possibility, even
the certainty, that an obligation to pay will arise in the future does not establish that a cost

has been incurred[.]" *Trimble*, 232 F.3d at 958; *see also Rolan v. Atlantic Richfield Company*, 2019 WL 5429075, at *6 (N.D. Ind. Oct. 22, 2019) (same).

If a plaintiff's obligation to reimburse response costs is contingent upon success in the litigation, there is no "existing legal obligation to reimburse [attorneys] for the response costs . . . allegedly incurred." *Roosevelt*, 222 F. Supp. 3d at 767; *see also Trimble*, 232 F.3d at 956 (holding that plaintiffs "failed as a matter of law to assert a legally viable private cost-recovery claim" where it was undisputed that "plaintiffs [would] be obligated to reimburse their attorneys for [response costs] only if plaintiffs ultimately prevailed in this litigation"); *Rolan*, 2019 WL 5429075, at *6 (granting summary judgment on CERCLA claims where there was no dispute "that counsel is representing Plaintiffs on a contingency basis").

Here, Plaintiffs plead that they have assumed a legal obligation to pay which the court must credit as true in adjudicating the pending motion. *See Wilson Road*, 971 F. Supp. 2d at 910 (holding that "[t]he inquiry turns on *who assumed a legal obligation to pay*") (emphasis in original). At the pleading stage, Plaintiffs' assertion that each individual Plaintiff is "legally obligated by contract to reimburse response costs[,]" incurred by their attorneys is therefore sufficient. (Doc. 160 at 42, ¶ 153.) If in discovery it is revealed that this obligation is merely contingent upon a successful outcome, Defendants may seek sanctions under Fed. R. Civ. P. 11.[1] Defendants' motion to dismiss Plaintiffs' cost recovery claims (Count I) and declaratory relief claims (Count II) under CERCLA is therefore CONDITIONALLY DENIED.

---

[1] Defendant OCC cites "two recent engagement letters used by Plaintiffs' counsel" in unrelated litigation to support its speculation that Plaintiffs' contractual obligations to pay the response costs are contingent. (Doc. 165-4 at 13.) In absence of judicial notice, which has not been requested, these documents are not properly before the court on a motion to dismiss. *See Trump v. Vance*, 2020 WL 4861980, at *10 (S.D.N.Y. Aug. 20, 2020) (holding that "[i]n adjudicating a Rule 12(b)(6) motion, a court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken.") (internal quotation marks and citation omitted).

C.    **Whether Plaintiffs Adequately Plead a Strict Liability Claim.**

Count VI of the TAC seeks to impose strict liability on all Defendants based on their conduct in "storing, disposing of, or otherwise releasing into the ground dangerous contamina[nts][.]" (Doc. 160 at 210, ¶ 738.) Under New York law, property owners are strictly liable for "abnormally dangerous or ultra-hazardous activities taking place on their property." *White Plains Housing Auth. v. Getty Props. Corp.*, 2014 WL 7183991, at *15 (S.D.N.Y. Dec. 16, 2014) (citing *Doundoulakis v. Town of Hempstead*, 368 N.E.2d 24 (N.Y. 1977)). Strict liability reflects New York's determination that "those who engage in activity of sufficiently high risk of harm to others, especially where there are reasonable even if more costly alternatives, should bear the cost of harm caused the innocent." *Abbatiello v. Monsanto Co.*, 522 F. Supp. 2d 524, 531 (S.D.N.Y. 2007) (internal quotation marks omitted) (quoting *Doundoulakis*, 368 N.E.2d at 24).

Under New York law, "whether a particular activity qualifies as 'abnormally dangerous'" is evaluated through consideration of the following factors:

> (a) existence of a high degree of risk of harm to the person, land[,] or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.

*See Abbatiello*, 522 F. Supp. 2d at 531; Restatement (Second) of Torts § 520 (1977). The Restatement counsels that no single factor is dispositive and that while "ordinarily several of them will be required for strict liability[,]" the factors need not unanimously support the same conclusion to warrant a finding that an activity is abnormally dangerous. *Town of New Windsor v. Avery Dennison Corp.*, 2012 WL 677971, at *11 (S.D.N.Y. Mar. 1, 2012) (citing Restatement (Second) of Torts § 520 cmt. f).

Plaintiffs allege that material deposited at the Site contained contaminants that pose a serious health risk to persons who come in contact with them. In addition, they assert that the health hazards associated with the contaminants allegedly present at the Site are sufficiently serious to outweigh any benefits the Site provided to Town residents.

They allege that depositing the material at a landfill near a residential area without "controls in place to prevent the immediate migration" of the wastes from the unlined landfill created a high degree of risk of harm. (Doc. 160 at 40, ¶ 148.) Defendants seek dismissal of this claim, arguing that Plaintiffs have failed to plausibly plead that Defendants engaged in an abnormally dangerous activity because the TAC also alleges that due care would have prevented the alleged harm.[2]

Under Fed. R. Civ. P. 8(d)(3), "[a] party may state as many separate claims or defenses as it has, regardless of consistency." At the pleading stage, Plaintiffs are not required to elect either a negligence or strict liability theory of recovery. *See Delgado v. Ocwen Loan Servicing, LLC*, 2017 WL 5201079, at *15 (E.D.N.Y. Nov. 9, 2017) (holding that "the liberal pleading standard of the Federal Rules of Civil Procedure . . . expressly contemplates pleading in the alternative regardless of inconsistency"); *St. John's Univ., N.Y., v. Bolton*, 757 F. Supp. 2d 144, 184 (E.D.N.Y. 2010) (finding that "Rule 8(d) ameliorates the uncertainty inherent in all litigation at the pleading stage by permitting plaintiffs to allege claims in the alternative, even if the legal theories underlying those claims are technically inconsistent or contradictory"). Their negligence claim against the Town therefore does not defeat their ability to assert a strict liability claim. *See Integrated Waste Servs., Inc. v. Akzo Nobel Salt, Inc.*, 113 F.3d 296, 201 (2d Cir. 1997) (observing that "[w]e doubt that ultrahazardous activity liability can be negated categorically by demonstrating that occasionally the same damage may also occur as a result of a defendant's negligence"). As the case progresses to trial, Plaintiffs may be required to elect a theory of recovery because the "inability to eliminate the risk

---

[2] *See* Doc. 160 at 210, ¶ 738 (alleging that Defendants' "failure to employ reasonable care which a reasonably prudent person should use under the circumstances by storing, disposing of, or otherwise releasing into the ground dangerous contaminations . . . constitutes ultra-hazardous and abnormally dangerous activities"); *id.* at 42, ¶ 152 (alleging that "[a]s a result of Defendants' negligence in the processing, distribution, transporting, storing, handling and/or disposing of hazardous substances into the areas surrounding [their] home[s]" each Plaintiff suffered personal injury and that "[a]s a result of Defendants' reckless, negligent, and grossly negligent conduct" each Plaintiff has suffered "severe physical injury, pain, and suffering."); *id.* at 222 (stating that punitive damages are requested because the causes of action "flow directly as a result of the wanton, willful and reckless conduct of the Defendants").

by the exercise of reasonable care" is a key feature of strict liability. Restatement (Second) of Torts § 520; *see also Nat'l R.R. Passenger Corp. v. N.Y. City Housing Auth.*, 819 F. Supp. 1271, 1279 (S.D.N.Y. 1993) (finding that "[m]ost useful for purposes of analyzing plaintiff's claim is whether the risk from the activity is able to be eliminated by the exercise of reasonable care.").

Although the TAC does not contain specific allegations concerning each of the Restatement factors, it need not do so in order to state a claim. *See Albahary v. City & Town of Bristol, Conn.*, 963 F. Supp. 150, 155 (D. Conn. 1997) (determining based on Restatement factors that "disposal of hazardous and toxic wastes at a municipal landfill involved a high degree of risk of harm to property and persons" and denying motion to dismiss strict liability claim); *see also Abbatiello*, 522 F. Supp. 2d at 533 (denying motion to dismiss strict liability claim where the court "d[id] not have sufficient evidence as to [four of the] factors listed in Restatement § 520" and thus was unable "to determine whether [Defendant's] actions constitute an abnormally dangerous activity").

In summary, while Plaintiffs' negligence-based allegations imply that any risk of harm could have been eliminated by the exercise of due care and thus may ultimately defeat their strict liability claims, at the pleading stage, they plausibly allege that certain Defendants engaged in an abnormally dangerous activity at the Site which created a high degree of risk of harm which was not outweighed by any benefits the Site provided to Town residents. Defendants' motion to dismiss Plaintiffs' strict liability claims for inadequate pleading is therefore DENIED.

### 1.    Whether Strict Liability Extends to the Non-Municipal Defendants.

The Non-Municipal Defendants contend that Plaintiffs' strict liability claims fail for the further reason that strict liability does not apply to generators of waste who deposit that waste on another's property. "New York common law imposes strict liability on *landowners* for certain abnormally dangerous or ultra-hazardous activities taking place on their property." *Read v. Corning Inc.*, 351 F. Supp. 3d 342, 357 (W.D.N.Y. 2018) (citations omitted) (emphasis supplied). Courts in the Second Circuit have found an

abnormally dangerous activity where off-site contamination was caused by the discharge or disposal of chemicals and hazardous products. *See, e.g., Town of New Windsor*, 2012 WL 677971, at *11 (finding defendant's discharge of chlorinated solvents from degreasing pits on their property was an abnormally dangerous activity); *Albahary*, 963 F. Supp. at 156 (concluding that "disposal of hazardous and toxic wastes at a landfill may constitute an abnormally dangerous or ultrahazardous activity sufficient to maintain a cause of action for strict liability"). One court has opined that:

> While the New York courts have not explicitly held that the disposal of hazardous wastes by the generator is, in itself, an abnormally dangerous activity requiring the application of strict liability standards, the language employed by the leading cases certainly indicate[s] that such a holding would not be unreasonable in a case such as the instant one, in which it is undisputed that such wastes have been released into the environment so as to endanger or injure the property, health, safety or comfort of a considerable number of persons.

*United States v. Hooker Chems. & Plastics Corp.*, 722 F. Supp. 960, 966-67 (W.D.N.Y. 1989) (internal quotation marks omitted).

In the absence of controlling precedent as to whether disposal of hazardous substances in a third party's landfill constitutes an abnormally dangerous or ultrahazardous activity, this court must predict the outcome under New York law. *See Cont'l Cas. Co. v. Pullman, Comley, Bradley & Reeves*, 929 F.2d 103, 105 (2d Cir. 1991) (finding that where a state's highest court has never decided the issue at bar, the court must "make [its] best estimate as to how [that state's] highest court would rule in this case") (internal quotation marks and citation omitted).

The Seventh Circuit, relying on the Restatement, held that a mere generator of polychlorinated biphenyls ("PCBs") could not be held strictly liable for harm caused by subsequent disposal of its product because the harm caused by the toxic material was "not caused by any abnormally dangerous activity of Monsanto" as Monsanto merely manufactured the PCBs and sold them to Westinghouse (and others) for industrial use. *City of Bloomington, Ind. v. Westinghouse Elec. Corp.*, 891 F.2d 611, 615 (7th Cir. 1989). Westinghouse, however, could be liable for an abnormally dangerous activity

because its waste containing PCBs was disposed of at various Bloomington area landfills. *Id.* (finding that the definition of "[o]ne who carries on an abnormally dangerous activity . . . would include Westinghouse but not Monsanto").

Unlike in *City of Bloomington*, the Non-Municipal Defendants in the instant action did not merely generate hazardous chemicals for industrial use, they allegedly disposed of industrial waste containing hazardous substances at the Site. Thus, the Non-Municipal Defendants are more akin to Westinghouse than to Monsanto. "That the companies conducted their disposal activities on the lands of another does not save them from strict liability if their activities were abnormally dangerous." *Fortier v. Flambeau Plastics Co., a Div. of Flambeau Corp.*, 476 N.W. 2d 593, 605 (Wis. Ct. App. 1991). As a result, while "[i]n most of the cases to which the rule of strict liability is applicable the abnormally dangerous activity is conducted on land in the possession of the defendant[,] [t]his, again, is not necessary to the existence of such an activity. It may be carried on in a public highway or other public place or upon the land of another." Restatement (Second) of Torts § 520 cmt. (e); *See Kenney v. Sci. Inc.*, 497 A.2d 1310, 1320-21 (N.J. Super. Ct. Law Div. 1985) (finding that "[a] company which creates the Frankenstein monster of abnormally dangerous waste should not expect to be relieved of accountability for the depredations of its creature merely because the company entrusts the monster's care to another, even an independent contractor").

At the pleading stage, although a close question, the court cannot predict that New York's highest court would reject a claim of strict liability based on a generator's disposal of toxic wastes on another's property when the generator has notice of where its waste is being disposed and facilitated its disposal. The court defers making a more conclusive determination of this issue until a factual record has been established. *See Adato v. Kagan*, 599 F.2d 1111, 1117 (2d Cir. 1979) ("Tenuous theories of liability are better assayed in the light of actual facts than in pleader's supposition."). The Non-Municipal Defendants' motion to dismiss the strict liability claims against them because

New York law does not recognize a claim in the circumstances of this case is therefore CONDITIONALLY DENIED.

### 2.    Whether Plaintiffs Adequately Plead a Strict Liability Claim Against OCC.

Defendant OCC contends that even if the Non-Municipal Defendants are subject to strict liability, such liability does not extend to OCC because it never deposited waste at the Site. Plaintiffs respond by pointing out that they allege OCC had knowledge of the transfer of the Love Canal waste to the Site and that OCC's construction of a brine/salt pipeline constitutes a separate ultrahazardous activity for which OCC can be held strictly liable.

In the TAC, Plaintiffs allege that "Defendants' . . . storing, disposing of, or otherwise releasing into the ground dangerous contaminations . . . constitutes ultra-hazardous and abnormally dangerous activities[.]" (Doc. 160 at 210, ¶ 738.) Beyond this conclusory allegation, they do not further allege that OCC stored, disposed of, or otherwise released any hazardous substance at the Site. Plaintiffs' sole allegation regarding OCC's conduct is that OCC "knew that Love Canal waste was transferred from the Love Canal site and disposed at the Nash Road Landfill[.]" (*Id.* at 188, ¶ 632.) Plaintiffs further allege that Town officials facilitated the Love Canal Waste transfer and that, without their approval, it "would not have gone forward." (Doc. 108 at 17.) The TAC cites the NYSDEC report which states that "NYSDOT [New York State Department of Transportation] disposed of approximately 1,600 cubic yards of [Love Canal] material" in an area at the Site. (Doc. 160-9 at 13.)

As OCC points out, Plaintiffs allege that it was government agencies that directed and carried out the transfer of the Love Canal Waste to the Site. Neither the report cited by Plaintiffs nor their own TAC mentions OCC's role in that activity. Plaintiffs' contention in their brief that they have "documentary evidence" that OCC "directly

participated in the transport and deposit of the waste at the landfill" is notably absent from the TAC. (Doc. 187-2 at 23.)

Allegations that OCC deposited hazardous substances elsewhere and knew that they were moved to the Site are insufficient to state a claim for strict liability because "ultrahazardousness or abnormal dangerousness is . . . a property not of substances, but of activities[.]" *Ind. Harbor Belt R.R. Co. v. Am. Cyanamid Co.*, 916 F.2d 1174, 1181 (7th Cir. 1990). Plaintiffs have thus failed to plausibly allege that Defendant OCC's actions caused their claimed injuries. *See City of Bloomington*, 891 F.2d at 616-17 (holding that "we are unwilling to extend the doctrine of strict liability for an abnormally dangerous activity to the party whose activity did not cause the injury" and that strict liability does not apply where "the injury was . . . the result of actions taken by a third party"); *Perkins v. F.I.E. Corp.*, 762 F.2d 1250, 1265 n.43 (5th Cir. 1985) (observing that strict liability under the Restatement "encompasses activities that are dangerous in and of themselves and that can *directly* cause harm to those in the vicinity") (internal quotation marks omitted) (emphasis in original).

Plaintiffs' further contention that OCC constructed a brine/salt pipeline which "has provided an additional pathway for site contamination" is insufficient as a matter of law because the construction of the pipeline is not alleged to be an abnormally dangerous activity. (Doc. 187-2 at 24.) Because Plaintiffs have failed to plausibly allege that OCC engaged in an abnormally dangerous activity which caused their injuries, OCC's motion to dismiss Count VI against it is GRANTED.[3]

### D.   Whether Plaintiffs Plausibly Plead Liability as to Bell Helicopter Textron, Honeywell, and Saint-Gobain.

#### 1.   Whether Plaintiffs Plausibly Plead Individual Liability.

Defendants BHT, Honeywell, and Saint-Gobain contend that because the TAC does not allege that they disposed of waste at the Site, any individual claims against them

---

[3] The Town argues that if the court grants OCC's motion to dismiss the strict liability claims, it must also dismiss the strict liability claims against the Town because the transfer took place pursuant to an approved regulatory scheme. Plaintiffs' strict liability claims against OCC fail not because the Love Canal waste was deposited pursuant to a regulatory scheme but because

must be dismissed. Plaintiffs respond that individual liability is properly pled because "it has not been determined when the current corporate entity took over the operations and/or liability of its predecessor." (*Id.* at 25.) This same contention, however, is not contained in the TAC. Even if it were to be included, it is bereft of factual content.

In the TAC, Plaintiffs do not allege that BHT, Honeywell, or Saint-Gobain disposed of waste at the Site. While a complaint is not required to provide detailed factual allegations at the pleading stage, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Plaintiffs' lack of certainty regarding which Defendants disposed of waste at the Site does not lessen their burden. They may assert allegations "upon information and belief" and state the facts upon which that knowledge and belief are grounded. *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (holding that "[t]he *Twombly* plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible") (internal quotation marks and citations omitted). Bare allegations that BHT, Honeywell, and Saint-Gobain are liable individually fall far short of this standard.

Because the TAC does not "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face" against BHT, Honeywell, or Saint-Gobain in their individual capacities, their motions to dismiss the individual claims against them in Counts I, II, and VI are GRANTED. *Elias*, 872 F.3d at 104 (internal quotation marks and citations omitted).

### 2.    Whether Plaintiffs Plausibly Plead Successor Liability.

Defendants BHT, Honeywell, and Saint-Gobain argue that Plaintiffs have also

---

Plaintiffs fail to plausibly allege that OCC played any role in its disposal. In contrast, Plaintiffs allege the Town facilitated the disposal of Love Canal waste at the Site and that, but for the Town's approval, it would not have taken place.

failed to plausibly plead a claim against them as successors in interest. Plaintiffs counter that all that is required at the pleading stage are allegations that BHT, Honeywell, and Saint-Gobain are successors in interest to Bell Aircraft, Bell Aerospace, and Carborundum Corporation, respectively,[4] which disposed of industrial waste at the Site.

"Under both New York law and traditional common law, a corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities." *New York v. Nat'l Servs. Indus. Inc.*, 460 F.3d 201, 209 (2d Cir. 2006) (citation omitted). This general rule is subject to the exception that "a buyer of a corporation's assets will be liable as its successor if: '(1) it expressly or impliedly assumed the predecessor's tort liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations.'" *Id.* (quoting *Schumacher v. Richards Shear Co., Inc.*, 451 N.E.2d 195 (1983)). "To state a claim based on successor liability, a plaintiff must plead enough facts for the Court to infer that one of the exceptions to the general rule finding that a business entity acquiring the assets from another business generally results in no successor liability." *New York v. Town of Clarkstown*, 95 F. Supp. 3d 660, 682 (S.D.N.Y. 2015) (internal quotation marks omitted).

With regard to BHT and Honeywell, the TAC fails to allege any facts that support a theory of successor liability. Plaintiffs merely state that BHT and Honeywell are successors in interest to Bell Aircraft and Bell Aerospace. "This allegation, standing alone, is insufficient for the court to infer that the general rule governing successor liability does not apply." *Id.* Plaintiffs' argument that "[a]ny dispute about successor status would require a fact-intensive inquiry[,]" (Doc. 187-2 at 25), is unavailing because even where successor liability is difficult to determine, Plaintiffs must still properly allege a non-speculative basis for liability. *See Town of Clarkstown*, 95 F. Supp. 3d at

---

[4] There appears to be some confusion as to whether Plaintiffs intend to allege that Honeywell is a successor in interest to Bell Aircraft or Bell Aerospace. For the purposes of this motion, the court assumes that Plaintiffs intend to allege that Honeywell is a successor in interest to both.

683 (holding that plaintiffs "must, at the very least, set forth the basis for their conclusory claim that successor liability is appropriate as to [defendant] before the [c]ourt may consider allowing [plaintiffs] to engage in limited discovery on the issue").

With regard to Saint-Gobain, although Plaintiffs attach exhibits to the TAC regarding the relationship between Saint-Gobain and Carborundum Corporation, these documents do not address the test for successor liability, and the court is not required to analyze them and extract from them factual allegations to flesh out Plaintiffs' bare-bones claim. *See Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir. 1988) (holding that "it is the plaintiff's burden to take the step which brings his case safely into the next phase of the litigation. The court need not conjure up unpled allegations or contrive elaborately arcane scripts in order to" allow the plaintiff's complaint to survive).

Similarly, Plaintiffs' reliance on Carborundum Corporation's listing with the New York State Department of State which identifies the company's current name as "Saint-Gobain Advanced Ceramics Corporation" and Saint-Gobain's admission that it purchased assets from Carborundum Corporation in 1996, while reflecting a relationship between Saint-Gobain and Carborundum Corporation, do not, without more, state a plausible claim of successor liability. *See Deluca v. Portland Orthopaedics Ltd.*, 2017 WL 6001781, at *4 (E.D.N.Y. Dec. 2, 2017) (holding that "a corporation that purchases the assets of another corporation is not automatically responsible for the seller's liabilities"); *see also Worldcom Network Servs. v. Polar Commc'ns Corp.*, 718 N.Y.S.2d 337, 338 (App. Div. 2000) (granting defendant's motion to dismiss where "the pleadings and evidence fail to provide any ground to infer a relationship between [alleged successor and predecessor], much less a relationship sufficiently close to serve as a predicate for the imposition of successor liability").

Because Plaintiffs have failed to plausibly plead either individual or successor liability against BHT, Honeywell, or Saint-Gobain, those Defendants' motions to dismiss and motion for judgment on the pleadings are GRANTED. For this reason, the court does not address these Defendants' alternative arguments for dismissal.

E.     **Whether the *Andres* Plaintiffs' Strict Liability Claims Against Industrial Holdings are Time-Barred.**

The statute of limitations may be raised "in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008). "A statute of limitations provides an affirmative defense, and the burden is on the defendant to establish when a federal claim accrues." *Gonzalez v. Hasty*, 651 F.3d 318, 322 (2d Cir. 2011).

The applicable statute of limitations for Plaintiffs' strict liability claims under New York law is three years from the date of the discovery of the injury. Plaintiffs do not dispute that the statute of limitations has run with regard to the *Andres* Plaintiffs; however, they argue that even those claims are not time-barred because they relate back to the original Complaint under Fed. R. Civ. P. 15(c). "The purpose of Rule 15(c)'s relation-back provision is 'to balance the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits.'" *Lehman XS Trust, Series 2006-GP2 by U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, 916 F.3d 116, 128 (2d Cir. 2019) (quoting *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 550 (2010)).

"If a complaint is amended to include an additional defendant after the statute of limitations has run, the amended complaint is not time barred if it 'relates back' to a timely filed complaint." *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 128 (2d Cir. 2001). An amendment that "changes the party or the naming of the party against whom a claim is asserted," Fed. R. Civ. P. 15(c)(1)(C), relates back if the following conditions are satisfied:

> (1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, *but for a mistake of identity,* the original action would have been brought against it; and . . . [4] the second and third criteria are

fulfilled within [90] days of the filing of the original complaint, and . . . the original complaint [was] filed within the limitations period.

*Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (emphasis and first and third alterations in original) (quoting *Barrow v. Wethersfield Police Dep't*, 66 F.3d 466, 468-69 (2d Cir. 1995)).[5]

In *Krupski v. Costa Crociere S. p. A.*, the Supreme Court identified the relevant inquiry under Rule 15(c)(1)(C) as "whether [the newly joined defendant] knew or should have known that it would have been named as a defendant but for an error[]. . . not what the plaintiff knew or should have known at the time of filing [its] original complaint." 560 U.S. at 548. It is Plaintiffs' burden to establish that relation back applies under Rule 15(c). *See Charlot v. Ecolab, Inc.*, 97 F. Supp.3d 40, 84 (E.D.N.Y. 2015) (denying relation back where plaintiffs "ha[d] not met their burden under Rule 15(c)(1)(B)").

Defendant Industrial Holdings acknowledges that the original Complaint in *Andres* was filed within the limitations period and that the claims against it arise out of the same conduct alleged against Carborundum therein, but it contends that Plaintiffs have failed to establish that Industrial Holdings had notice of the *Andres* claims within 90 days of the filing of the original Complaint. "To determine whether the notice element of Rule 15(c) has been satisfied, the [c]ourt must make two inquiries. First, did [new defendant] receive notice of plaintiff's action within [90] days of the filing of the Complaint? And, if so, was that notice sufficient to avoid prejudicing him in defending claims against him?" *Curry v. Campbell*, 2012 WL 1004894, at *3 (E.D.N.Y. March 23, 2012) (internal quotation marks and citation omitted); *see also Girau v. Europower, Inc.*, 317 F.R.D. 414, 421 (S.D.N.Y. 2016) (holding that for the addition of a new defendant to

---

[5] Fed. R. Civ. P. 15(c)(1)(A) also permits relation back if "the law that provides the applicable statute of limitations allows relation back." "Whether a claim relates back should be analyzed under both federal and state law, and whichever law that affords a more forgiving principle of relation back should be utilized." *Laureano v. Goord*, 2007 WL 2826649, at *5 (S.D.N.Y. Aug. 31, 2007) (internal quotation marks and citation omitted). Because "New York's general relation-back statute, § 203 of the Civil Practice Law and Rules, is 'patterned largely after the Federal relation back rule[,]'" and because the parties appear to agree that the federal rule affords the most forgiving rule, the court analyzes relation back under the federal rule. *Liverpool v. Davis*, 442 F. Supp. 3d 714, 726 (S.D.N.Y. 2020).

relate back, they "must have received such notice of the action that the late addition will not prejudice their defenses") (internal quotation marks and citation omitted). "Notice for the purposes of the Rule can be either actual or constructive." *Id.*

Plaintiffs argue that Industrial Holdings was on notice of the original Complaint because several television and newspaper stories publicized the *Andres* lawsuit. However, only one of the cited publications mentions Carborundum, and none of the publications mention Industrial Holdings. Without more, the public nature of an action does not satisfy the notice requirement for purposes of relation back. *See In re Motors Liquidation Co.*, 563 B.R. 498, 508 (Bankr. S.D.N.Y. 2016) (finding that "the mere public nature of the litigation is insufficient to prove" that defendant was on notice of the claims).

Other than media reports, Plaintiffs have not alleged that Industrial Holdings had actual or constructive notice of the *Andres* Complaint. In the Second Circuit, a plaintiff may impute notice to a later-joined defendant under the "identity of interest exception." *See Hahn v. Office & Prof'l Emps. Int'l Union, AFL-CIO*, 107 F. Supp. 3d 379, 384 (S.D.N.Y. 2015) (finding that "courts within the Second Circuit have generally held that [the identity of interest exception] is a valid manner of showing imputed notice to a prospective defendant"). Under this exception, "the institution of an action against one party will constitute imputed notice to a party subsequently named by an amendment of the pleading when the parties are closely related in their business activities or linked in their corporate structure." *In re Allbrand Appliance & Television Co., Inc.*, 875 F.2d 1021, 1025 (2d Cir. 1989).

Plaintiffs attached discovery responses in an unrelated action dated March 12, 2014 to the TAC which "describe[] the corporate chain that makes [Industrial Holdings] a successor to Carborundum." (Doc. 212 at 23.) [6] However, these discovery responses do not address the relationship between Industrial Holdings and Carborundum Corporation

---

[6] Defendant Industrial Holdings faults Plaintiffs for failing to include this information in the original *Andres* Complaint, but while "[Rule 15(c)] plainly sets forth an exclusive list of requirements for relation back, [] the amending party's diligence is not among them." *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 553 (2010).

as of the date of the original *Andres* Complaint. Even if Plaintiffs' factual allegations are sufficient to show that Industrial Holdings is a successor in interest to Carborundum Corporation, they have failed to allege that either entity received notice of the original Complaint. Accordingly, Plaintiffs have not met their burden to establish that Industrial Holdings had notice of the original *Andres* Complaint within 90 days of its filing.

Because the 'mistake' requirement of Rule 15(c) requires that a defendant *knew or should have known* that it would have been named as a defendant but for the plaintiff's mistake, this requirement "can never be met in situations where [defendants] were unaware, even constructively, of the lawsuit." *Girau*, 317 F.R.D. at 422. At this juncture, the Plaintiffs' claims appear to be time-barred and Industrial Holdings' motion to dismiss the *Andres* Plaintiffs' strict liability claims on this ground is GRANTED.

**F.      Whether the Court Should Reconsider its Prior Rulings Regarding Strict Liability Claims against the Town.**

The Town contends asks the court to amend its prior ruling that Plaintiffs have plausibly alleged a claim of strict liability against the Town. Fed. R. Civ. P. 54(b) states in relevant part that "any order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." "The major grounds justifying reconsideration are 'an intervening change in controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice.'" *United States v. Posada*, 206 F. Supp. 3d 866, 867 (S.D.N.Y. 2016). The Town does not contend that the court previously made a "clerical mistake or a mistake arising from oversight or omission" that it would be permitted to correct under Fed. R. Civ. P. 60(a). It does not cite any intervening change in controlling law or new facts. The court has rejected the Town's argument that strict liability does not exist for

actions that take place pursuant to a regulatory scheme without controlling precedent dictating that result. The Town's request for reconsideration is therefore DENIED.

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART AND DENIES IN PART Defendants' motions to dismiss, (Docs. 165, 166, 167 168, 170, 171, 172, 195), and GRANTS Saint-Gobain's motion for judgment on the pleadings (Doc. 216.)

SO ORDERED.

Dated this _30th_ day of December, 2020.

Christina Reiss, District Judge
United States District Court